UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA          )
                                  )          Case No. 1:17-cr-131-HSM-SKL
v.                                )
                                  )
MONTEZ MURPHY                     )

## REPORT AND RECOMMENDATION

Before the Court is a "Motion To Suppress, Or, In The Alternative, Motion In Limine Concerning Out-Of-Court And In-Court Identifications Of Defendant Due To Unduly Suggestive Conduct By Law Enforcement" filed by Defendant Montez Murphy ("Defendant") [Doc. 31]. Defendant seeks to suppress the sole eyewitness's identifications of him as the perpetrator of an alleged kidnapping and robbery on constitutional grounds or, alternatively, exclude evidence on Federal Rule of Evidence 403 ("Rule 403") grounds.  The United States of America (the "Government") filed a response in opposition [Doc. 36].[1]  No reply was filed, but each party submitted a timely post-hearing brief [Docs. 42, 43].  This matter is now ripe.

It seems undisputed that Dr. Eric Ellis ("Dr. Ellis") was the victim of a kidnapping/robbery on February 27, 2017.  Less than a week later, on March 4, 2017, Defendant was arrested on state charges for the crimes perpetrated against Dr. Ellis.  About six months later, on September 26, 2017, Defendant was federally indicted on related charges of kidnapping Dr. Ellis, bank robbery, robbery of Dr. Ellis, and brandishing a firearm during these crimes of violence [Doc. 1].

If this case goes to trial, the key factual dispute will be the identity of the kidnapper/robber. In this classic whodunit, Dr. Ellis appears to be the lone eyewitness.  In his pending motion,

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 32].

1

Defendant seeks to suppress Dr. Ellis's eyewitness identifications of him as the perpetrator.

After considering the evidence and arguments, I **RECOMMEND** that Defendant's motion to suppress on constitutional due process grounds be **DENIED** and that the Court reserve ruling on the Defendant's alternative motion in limine arguments for exclusion of evidence at trial under Rule 403.

## I.    FACTUAL BACKGROUND

During the evidentiary hearing on Defendant's motion to suppress held on September 6, 2018, Defendant presented the testimony of Hamilton County Executive Assistant District Attorney Cameron Williams ("Attorney Williams"), Chattanooga Police Department ("CPD") Detective Bryon Boller ("Det. Boller") and CPD Sergeant Jon Watkins ("Sgt. Watkins"). The Government presented the testimony of Dr. Ellis.

Dr. Ellis asserts he was robbed after being kidnapped at gunpoint from a store parking lot on Monday, February 27, 2017 around 5:10 p.m. According to Dr. Ellis, an African-American man—wearing a hoodie sweatshirt with the hood up, but not wearing a mask or gloves—opened the passenger side door of his truck, brandished a firearm, and entered the front passenger seat. The man, who eventually said that his name was Michael and that he was homeless, ordered Dr. Ellis to drive away. A short distance later, the man ordered Dr. Ellis to stop at what the man said was a crack house and give him money. Dr. Ellis complied and gave the man $200 out of his wallet.

Seeing Dr. Ellis's credit/bank cards, the man then ordered Dr. Ellis to drive to a nearby bank, withdraw $200 from the drive-through automated teller machine ("ATM"), and give it to him. While at the ATM, the man pulled the hood of his hoodie forward to conceal his face from

the ATM camera. After Dr. Ellis drove away from the ATM, the man commanded Dr. Ellis to drive to a nearby vacant lot.

As the man left Dr. Ellis's truck, he took Dr. Ellis's cell phone so that Dr. Ellis could not immediately summon the police. Dr. Ellis drove away and was almost immediately able to wave down a CPD patrol officer around 5:30 p.m. Dr. Ellis and the patrol officer returned to the store and the CPD's ensuing investigation began that same night.

Dr. Ellis acknowledged he was "scared to death" and focused on driving during much of the 20 to 25 minute encounter. In spite of driving and having a gun shoved in his side at least twice during the ordeal, Dr. Ellis contends that he got a good look at the perpetrator's face as he engaged the man in conversation. During the hearing, Dr. Ellis described the perpetrator as a heavier, African-American man with a rough, shaven face. He also said the man's hoodie was blue, the man wore dark saggy pants, and the man looked "kind of unkept."

Sgt. Waktins, at the time a CPD detective, was assigned to the case as the lead investigator. That evening, Det. Boller, then a CPD investigator, "lifted" fingerprints from the truck, including from the exterior of the front passenger door. The kidnapper/robber had placed his hand on the exterior of the passenger door during the ordeal, according to Dr. Ellis. Dr. Ellis testified that the officer who "did the printing" told him that he "found a great fingerprint, a full set on the passenger door." Based on a match of Defendant's fingerprints to the print taken from the exterior of the front passenger door, Det. Boller and Sgt. Watkins began to focus on Defendant. While Defendant was previously unknown to the officers, he had a criminal record and was listed in CPD records as being affiliated with a local gang. Det. Boller retrieved an arrest photograph, *i.e.*, a mugshot, of Defendant taken when Defendant was a juvenile.

Using Defendant's juvenile mugshot, Det. Boller employed a CPD computer program designed to generate either a six- or an eight-photograph lineup. The computer program is intended to select photographs of persons with characteristics—such as gender and race—that are similar to a suspect's mugshot or other photograph. The resulting photographic lineup in this case consisted of six full-page photocopies of photographs (a "six-pack lineup") of black males [Defendant's Exhibit 2]. Defendant's juvenile mugshot was the third photograph in the six-pack lineup.

The day after the crime, Tuesday, February 28, 2017, Det. Boller and another CPD patrol officer presented the six-pack lineup to Dr. Ellis in the parking lot of the hospital where Dr. Ellis worked to see if Dr. Ellis could identify the kidnapper/robber. Pursuant to CPD policy, Det. Boller presented the six-pack lineup instead of Sgt. Watkins because Det. Boller was less involved in the investigation. This policy exists to lessen the chance of police suggestion of the photograph of the person the police suspect to the eyewitness. At the time of the six-pack lineup, Dr. Ellis had had no communications with the CPD since the prior night other than a call about the logistics of where and when to meet for the lineup.

Before the six-pack lineup was shown to Dr. Ellis, Det. Boller gave instructions to Dr. Ellis to look for remembered facial characteristics because the photographs might be "older" or newer, and the depicted person could weigh more or less or have different facial hair. Initiating the six-pack lineup presentation, the photographs were laid across the hood of the patrol car for Dr. Ellis to consider. The presentation is recorded [Defendant's Exhibit 1], but the audio of some of the conversation between Det. Boller and Dr. Ellis is not recorded based on the testimony.

As the third photograph in the six-pack lineup, Defendant's juvenile mugshot was placed in the center of the lineup array, which was laid across the hood of the patrol car.[2] Dr. Ellis almost immediately excluded the photograph of Defendant, along with three other photographs, saying they did not depict the perpetrator. He then selected one of the two remaining photographs as being of the perpetrator. When asked if he was certain of his selection during the six-pack lineup, Dr. Ellis said he was "100% sure" the selected photograph depicted the perpetrator.

Det. Boller never directly identified *any* of the photographs in the six-pack lineup—either the selected or excluded photographs—as being of Montez Murphy. However, as soon as the photographs were put away, Det. Boller asked Dr. Ellis if he knew anybody by the name of Montez Murphy and Dr. Ellis replied he did not. Det. Boller then asked if there was any reason why Montez Murphy's fingerprints would be "on or in" Dr. Ellis's truck. Dr. Ellis said there would be no such reason. Det. Boller asked Dr. Ellis these questions because Det. Boller knew the CPD had been able to lift and identify Defendant's fingerprints from the exterior of the passenger door of Dr. Ellis's truck and yet Dr. Ellis had selected the photograph of someone else as the perpetrator—and had excluded Defendant's photograph.

Dr. Ellis testified he asked the officers if he had picked the "photograph of the person whose fingerprints were on my truck and they said no." Dr. Ellis specifically testified, "They told me I did not select the right one." In addition, Dr. Ellis testified he "knew" from Det. Boller's questions, that Montez Murphy was the name of the person the CPD suspected based on the

---

[2] At the suppression hearing, Dr. Ellis testified he was shown five photographs, but the evidence is overwhelming that he was actually shown six photographs, and I so **FIND**. Dr. Ellis also indicated he may have been questioned about the name Montez Murphy before the six-pack lineup, but Det. Boller testified he asked about the name after. The video shows Det. Boller raising Defendant's name after Dr. Ellis identified another man's photograph as the perpetrator.

fingerprint evidence. Specifically, he testified, "I knew that Montez Murphy's fingerprints were on my truck and that's the person that I should have selected. And, I was bothered by why could I not have picked out his photograph." Dr. Ellis testified that he felt as if he had "failed a test" by selecting the wrong photograph the day of the six-pack presentation.

The following Saturday, March 4, 2017, Defendant was arrested on state charges for the crimes perpetrated against Dr. Ellis. As a result, a March 4 mugshot of Defendant was taken by the CPD. The March 4 mugshot of Defendant was published that same day in "Right2Know," an online publication of a private news organization. Defendant's Exhibit 6 is a printout of the "Right2Know" publication of Defendant's March 4 mugshot that indicates it was one of 28 new mugshots from Hamilton County published online by the news organization that day.

Exactly when Dr. Ellis first saw that March 4 mugshot is far from clear. In Dr. Ellis's testimony at the earlier state court preliminary hearing on March 14, 2017, he testified that he first saw the March 4 mugshot after he was notified by email of Defendant's arrest.[3] In the suppression hearing, however, Dr. Ellis testified he did not know of the arrest when he "googled" Defendant's name; instead, he had become curious about the name Montez Murphy mentioned by Det. Boller

---

[3] I hesitate to call this an out-of-court "identification" because it is perhaps more accurately described as a realization. The parties submitted no proof that this identification—which is not mentioned in the emails—was ever communicated by Dr. Ellis to law enforcement in any way other than perhaps just prior to the preliminary hearing where Dr. Ellis made an in-court pretrial identification. In the version of events promulgated in the Government's original brief, Dr. Ellis was informed of Defendant's arrest from Sgt. Watkins in an email on March 6, and then spontaneously "googled" Defendant's name and found the March 4 mugshot [Doc. 36 at Page ID # 130]. While the Government's version is not evidence, it is consistent with Dr. Ellis's testimony at the state preliminary hearing as detailed herein. An audiotape of portions of the preliminary hearing and a transcript of those portions of the hearing were marked as Defendant's Exhibit 5, and support this version of events. The email exchange between Dr. Ellis and Sgt. Watkins also suggests Dr. Ellis did not know that Defendant was under arrest until after he received the March 6 email, [Defendant's Exhibits 3 & 4], in spite of Dr. Ellis's contradictory testimony.

during the six-pack lineup so he "googled" the name Saturday evening (March 4) and discovered the arrest. During the suppression hearing, Dr. Ellis also expressed some uncertainty about exactly when he first looked up the March 4 mugshot. Nevertheless, Dr. Ellis consistently testified in both hearings that he conducted an online "google" search on his own and located the March 4 mugshot of Defendant. Upon finding the March 4 mugshot, Dr. Ellis immediately concluded Defendant's March 4 mugshot depicted the man who had kidnapped and robbed him. He testified the March 4 mugshot was "without a doubt" a photograph of the person in his vehicle.

None of the witnesses testified about any contact between Dr. Ellis and the CPD between the February 28 six-pack lineup and the following Monday, March 6, 2017. On that Monday at 1:34 p.m., Dr. Ellis sent an email to Sgt. Watkins stating: "Dr. Eric Ellis here. Any leads on my little incidence[sic] last Monday? I know the finger prints yielded a match but I was unable to id the guy. What's next? Still want to get this guy off the streets." [Defendant's Exhibit 4].[4] This email does not mention that Dr. Ellis had seen the March 4 mugshot.

At 4:50 p.m. on that same day, Sgt. Watkins sent a reply email to Dr. Ellis stating, among other things, that a suspect had been identified from the fingerprint evidence, the suspect was Montez Murphy, and he had been arrested March 4 and charged for the crimes perpetrated against Dr. Ellis [id.]. The reply email also estimated when Defendant's initial court hearing would take place. The reply stated Defendant was a "threat to our community" and that, with the collaboration of the FBI and ATF, there should be "a long reprieve from [Defendant's] predatory acts within

---

[4] Little-to-no evidence was submitted regarding any efforts made by the Government to locate emails between Dr. Ellis and the CPD other than Sgt. Watkins' testimony indicating that he unsuccessfully looked for such emails on his computer at some point. On the day prior to and on the day of the suppression hearing, however, Dr. Ellis apparently provided copies of his above-described March 2017 email exchange with Sgt. Watkins [Defendant's Exhibit 4], plus a May 2017 email exchange about a possible state court trial date [Defendant's Exhibit 3].

Chattanooga," and that Dr. Ellis should expect to hear from the FBI and the ATF soon as they would also be seeking to prosecute Defendant [*id*.].

Dr. Ellis appeared as a witness in the Hamilton County General Sessions Court for Defendant's preliminary hearing on March 14, 2017. Prior to testifying, Dr. Ellis met with Attorney Williams (and possibly Sgt. Watkins) to prepare. During the meeting, Dr. Ellis informed Attorney Williams about his failure to identify Defendant in the six-pack lineup and about his subsequent google investigation and observation of the online March 4 mugshot. Evidence at the suppression hearing did not clearly indicate when after the Defendant's arrest Dr. Ellis first informed a member of the CPD that he found the March 4 mugshot in a google search and concluded Defendant was the kidnapper/robber.

During the state court preliminary hearing, and again at the suppression hearing, Dr. Ellis identified Defendant as the perpetrator. Dr. Ellis testified he had no doubt at all in his mind when identifying Defendant as the perpetrator at the preliminary hearing and again at the suppression hearing. At the time of both identifications, Defendant was the only shackled, black man dressed in inmate attire present at the podium in state court and at the defense table during the suppression hearing.

Explaining why he excluded the photograph of Defendant (and three others) during the six-pack photographic lineup at the preliminary hearing, Dr. Ellis testified that the men in the quickly excluded photographs appeared to be thinner with more of a "Latino decent" than the perpetrator.[5] Regarding the two photographs left at that point, and the photograph he ultimately identified as being of the alleged perpetrator, Dr. Ellis testified at the preliminary hearing that he chose one of

---

[5] Det. Boller testified that, in his opinion, none of the four photographs quickly excluded by Dr. Ellis during the six-pack lineup, including Defendant's, had a Latino appearance.

8

the two remaining photographs because it showed a man with a "rough face" while the other remaining photograph showed a clean shaven, handsome man. During the suppression hearing, Dr. Ellis said he selected the photograph of the "meaner looking person" and the "scariest guy" from the two remaining photographs.[6]

Comparing Defendant's juvenile mugshot to Defendant's March 4 mugshot and with the way Defendant allegedly looked on the day of the incident, Dr. Ellis concluded his prior misidentification during the six-pack lineup made "sense" because Defendant was younger and clean-shaven in the juvenile mugshot. Dr. Ellis also concluded that both the March 4 mugshot and Defendant's appearance at the preliminary hearing revealed a rougher look with more facial hair than was shown in the juvenile mugshot.

Attorney Williams at some point also looked at the juvenile mugshot of Defendant and found that Dr. Ellis's explanation of why he did not select that photograph made sense because it showed Defendant when he was younger and clean-shaven. According to Attorney Williams, in the March 4 mugshot Defendant looked rougher, and in the preliminary hearing he looked even rougher, than was depicted in the juvenile mugshot. No evidence was offered concerning the date the juvenile mugshot was taken, but the witnesses at the suppression hearing generally opined the juvenile mugshot depicted Defendant when he was younger, thinner, and cleaner-shaven.

Sgt. Watkins testified it is common practice for the CPD to inform the victim of the arrest of a suspect and other case developments. In addition, either the District Attorney's Office, the CPD, or perhaps both must inform the victim/witness of the date/time/place of the preliminary hearing, including the name of the case, which also identifies the person charged. Sgt. Watkins

---

[6] This testimony is some indication that Dr. Ellis believed a photograph of the perpetrator would be present in the six-pack lineup array, although he was not directly asked about any such belief.

9

acknowledged it is easy for the public to look up mugshots on the internet and not surprising that a witness/victim would do so.

During the suppression hearing, Sgt. Watkins and Attorney Williams could recall no investigation into the person depicted in the selected photograph during the six-pack lineup. Neither CPD witness indicated he made an effort to determine other possible ways that Defendant's fingerprints might have ended up on Dr. Ellis's truck other than asking Dr. Ellis questions about that possibility during the six-pack lineup. The law enforcement witnesses also acknowledged that, given the nature of the charges against Defendant in state court and his alleged gang affiliation, this case was of heightened interest and significance to them and the community.

Concerning another matter of potential interest, Dr. Ellis testified that he reviewed a video from a smoke shop camera on the day of the kidnapping/robbery that captured relevant moments of the incident. He was "certain" that the CPD officers were aware the night of the incident that there was video surveillance evidence from the adjacent shop showing Defendant in the parking lot at 5:01 p.m. near Dr. Ellis's vehicle as Dr. Ellis approached his vehicle. At least one, if not both, of the CPD officers testified they were not aware of any video surveillance evidence of the incident from the surrounding stores.

## II.  ANALYSIS

Defendant challenges Dr. Ellis's pretrial identifications and any future identification at trial under the Due Process Clause and under Rule 403. I will address Defendant's constitutional challenge first, and then turn to his evidentiary challenge.

### A.  Due Process Challenge

Defendant seeks to exclude from evidence all past and future identifications of him by Dr. Ellis on due process grounds. Specifically, Defendant seeks to suppress what he identifies as two

out-of-court identifications, which are perhaps more accurately described as an out-of-court identification via the March 4 mugshot viewed on the internet and an in-court pretrial identification during the state court preliminary hearing.[7] Defendant complains that these identifications violate due process because Dr. Ellis identified him as the perpetrator based on his online March 4 mugshot only after the police first asked about Defendant by name and disclosed that his fingerprints were on the truck, and second, charged Defendant as the perpetrator—all before Dr. Ellis ever identified Defendant as the kidnapper/robber. Defendant makes similar complaints about "any future show up identifications" in these federal proceedings [Doc. 31 at Page ID # 99]. The Government's response to the motion argues there is neither a substantial likelihood of misidentification by Dr. Ellis nor any police-arranged unnecessary suggestiveness in any of the past (or in any future) identifications, so a jury should decide what weight to afford Dr. Ellis's identifications.

Due process may prohibit the admission of evidence where fundamental unfairness would result. *See, e.g.*, U.S. Const. amend. V. ("No person shall be held to answer for a capital or otherwise infamous crime . . . without due process of law . . . ."); *Dowling v. United States*, 493 U.S. 342, 352-53 (1990). The Supreme Court has long recognized "a due process check on the

---

[7] It is undisputed that Dr. Ellis failed to identify Defendant from his juvenile mugshot during the six-pack photographic lineup. Defendant does not contend the specific array of six photographs displayed on the patrol car hood was unduly suggestive, presumably because Dr. Ellis did not identify Defendant during the six-pack lineup. Defendant does complain that the photograph of Defendant was unduly emphasized, for example by being placed in the middle of the lineup twice and having a weight placed upon it to keep it from blowing away in the wind. These arguments do not further Defendant's cause in my view since the juvenile photograph was never identified as being of Defendant by the CPD or as being of the assailant by Dr. Ellis. Accordingly, it is not necessary to consider the size of the array, the manner of its presentation by Det. Boller, or other details of the photographs in the six-pack presentation in this case. It is worth noting, however, that arrays of only six photographs have routinely been upheld as not being suggestive. *See, e.g., United States v. Peterson*, 411 F. App'x 857, 864-65 (6th Cir. 2011).

admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

The courts employ a two-step analysis to determine whether identification testimony should be excluded based on due process concerns. *United States v. Washington*, 714 F.3d 962, 967 (6th Cir. 2013) (quoting *United States v. Sullivan*, 431 F.3d 976, 985 (6th Cir. 2005)). Under this two-step approach, "[s]uppression is warranted only if (1) the identification procedure was unduly suggestive, and (2) the identification was not otherwise reliable under the totality of the circumstances." *United States v. Watson*, 540 F. App'x 512, 515 (6th Cir. 2013) (citations omitted); *see also Howard v. Bouchard*, 405 F.3d 459, 469-72 (6th Cir. 2005) (discussing two-step analysis). As both steps must be met for suppression, it is not necessary to assess the second step if the first is not met. *See Watson*, 540 F. App'x at 515.

### 1. The First Step

Under the first step of the due process analysis, mere suggestiveness does not give rise to a constitutional violation—only police-arranged, unnecessary suggestiveness creates a substantial likelihood of misidentification giving rise to a constitutional due process violation. *Perry*, 565 U.S. at 232; *Watson*, 540 F. App'x at 515 (citation omitted). "Unnecessary suggestiveness generally depends upon whether the witness's attention was directed to a suspect because of police conduct." *Howard*, 405 F.3d at 469-70 (internal quotation marks and citation omitted). This is an objective, totality-of-the-circumstances test examining the effects and circumstances of the identification procedure, rather than a subjective inquiry into the officer's intent. *Id.* at 470 (citing *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986).

12

Consequently, due process requires exclusion of identification evidence when a police-conducted identification procedure is "so unnecessarily suggestive" as to create a "likelihood of misidentification." *Howard*, 405 F.3d at 469 (citing *Biggers*, 409 U.S. at 198); *Watson*, 540 F. App'x at 514-15 ("Due process forbids police officers from using identification procedures that are 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The burden of showing unnecessary suggestiveness falls on the defendant. *See, e.g., United States v. Meyer*, 359 F.3d 820, 824 (6th. Cir. 2004) (citation omitted).

Significantly, due process "does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry*, 565 U.S. at 248 ("A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, show-ups, and photographic arrays in the first place." *Id*. at 241); *Watson*, 540 F. App'x at 515 (holding the "guiding rationale behind this prohibition is not to ensure the reliability of identification evidence, but to deter malfeasance by investigating officers" (citation omitted)). If the defendant fails to show that the identification procedure was tainted by undue police-arranged suggestiveness, the analysis ends. *Watson*, 540 F. App'x at 515 (citation omitted).

The Government argues Defendant cannot meet his burden to prove the identification process in this case was impermissibly suggestive because Dr. Ellis, on his own, "googled" Defendant and recognized him from an arrest mugshot. Further, the Government argues that when Dr. Ellis identified Defendant at the state preliminary hearing (and again at the suppression hearing) he knew Defendant was under arrest—like any other victim identifying a charged suspect

13

in an in-court proceeding in a criminal case. The crux of the Government's argument is that the CPD did nothing impermissibly suggestive by informing Dr. Ellis about who was charged, which occurs in every case with a victim. The Government contends that "[b]y logical extension, were the defendant's argument to prevail, then victims could never identify a defendant in court because their mere presence as the accused would be 'impermissibly suggestive' to the victim that they committed [the] crime." [Doc. 36 at Page ID # 132]. I agree with most of the substance of the Government's argument.

I disagree, however, with the Government's argument that "CPD did not hint or otherwise tell [Dr. Ellis] that the defendant left the print(s)" on his truck. [Doc. 42 at Page ID # 148]. Even if Det. Boller did not directly tell Dr. Ellis that Defendant's prints were on the truck, he certainly hinted at it. Indeed, the breadcrumbs of information that Det. Boller intentionally or unintentionally left for Dr. Ellis to follow were plenty for Dr. Ellis to determine that the CPD suspected Defendant was the kidnapper/robber based on the fingerprint evidence. It is not credible to argue otherwise based on Dr. Ellis's testimony. Dr. Ellis also testified he was specifically told that he failed to select "the right" photograph during the six-pack lineup.

In spite of this indiscretion by the CPD during the six-pack lineup, Dr. Ellis's first "identification" of Defendant as the perpetrator occurred only when Dr. Ellis viewed Defendant's March 4 mugshot after conducting his own internet search of Defendant's name. It is undisputed that Dr. Ellis found the *post-arrest* March 4 mugshot during his own search of the internet for information about the man he knew the CPD either suspected based on fingerprint evidence or had told him was arrested in an email. Whether Dr. Ellis's internet investigation was prompted by his own curiosity after learning that Defendant's fingerprints were on his truck or after being informed

14

of the arrest by email, the evidence is that he spontaneously found the March 4 mugshot on a public website only after the Defendant had already been arrested.

It is not uncommon for a photograph of the suspect to be displayed in the newspapers and online. The publication of the March 4 mugshot resulted in what was essentially a "showup"— the viewing by a potential witnesses of a single photograph of the person the police suspect, which is certainly a suggestive circumstance. The Sixth Circuit has advised, however, that even *police-arranged* showup identifications, which are "inherently suggestive," may be "a necessary identification procedure." *Summitt v. Bordenkircher*, 608 F.2d 247, 252 (6th Cir. 1979) (citation omitted) (holding that despite the suggestiveness of the identification process, "[b]ased on the totality of the circumstances, we cannot conclude that the identification at the showup was so unreliable as to create a substantial likelihood of misidentification."). Many courts, including this Court, find pretrial showup identifications to be reliable, despite their inherently suggestive nature. *See, e.g., United States v. Craig*, 198 F. App'x 459, 466, n.1 (6th Cir. 2006) (collecting cases and holding a "number of other courts have also held that prompt, on-scene show-ups of suspects to witnesses are not impermissible or unduly suggestive. Prompt on-the-scene confrontation is actually consistent with good police work."); *United States v. Yancy*, No. 11-CR-20108 A/P, 2012 WL 1252530, at *8 (W.D. Tenn. Mar. 5, 2012), *report and recommendation adopted,* No. 11-20108-STA, 2012 WL 1252526 (W.D. Tenn. Apr. 13, 2012), *aff'd,* 725 F.3d 596 (6th Cir. 2013) (affirming sentence); *United States v. Potter,* 2010 WL 2776342, at *5–8 (E.D. Tenn. 2010).

At the time Dr. Ellis first saw the March 4 mugshot that led to his out-of-court conclusion that Defendant was the perpetrator, he knew Defendant was the person charged and he knew Defendant's fingerprints were found on his truck based on his interaction with the CPD during the six-pack lineup. Similarly, he knew during the in-court identifications at the state court

preliminary hearing, and again at the suppression hearing, that Defendant was the person charged, and he will know this at any future federal proceedings. This inherent suggestiveness does not end the inquiry. A critical question for the due process analysis is whether the *police arranged unnecessary* suggestiveness in connection with Dr. Ellis's identification of Defendant. The facts and holding in *Perry* help to demonstrate why I **CONCLUDE** the online March 4 mugshot observation and later in-court identifications are not the result of police-arranged unnecessary suggestiveness.

In *Perry*, a woman looked out her apartment window and witnessed a man breaking into vehicles in the parking lot of the apartment. *Perry*, 565 U.S. at 233-34. The crime was reported by telephone and a police officer promptly arrived and detained a suspect, Mr. Perry, in the parking lot. *Id*. While one officer detained Mr. Perry, another officer went to the witness's apartment to interview her. *Id*. When the interviewing officer asked for a description of the thief, the woman went to and pointed out her window to Mr. Perry, who was still being detained in the parking lot by the second officer, and identified him as the culprit. *Id*. About a month later, the police showed the woman a photographic array that included a picture of Mr. Perry, but she was unable to identify Mr. Perry in the array. *Id*. at 234. Mr. Perry raised a due process challenge in a suppression motion arguing the woman witnessed what amounted to a pretrial "showup" identification in the parking lot, which all but guaranteed the woman would identify him as the culprit. *Id*. at 235. The trial court denied the motion and the officer and the woman testified about her out-of-court identification at the trial. The jury found Mr. Perry guilty of theft. *Id*. at 236.

Mr. Perry appealed the denial of his motion to suppress. *Id*. On appeal, Mr. Perry argued for a rule requiring trial judges to prescreen eyewitness evidence for reliability any time an identification is made under suggestive circumstances regardless of whether law enforcement was

responsible for creating the suggestive circumstances that marred the identification. *Id*. The New Hampshire Supreme Court rejected Mr. Perry's argument on appeal and affirmed his conviction, finding that due process requires a trial court to assess the reliability of identification evidence before permitting a jury to consider it only where the police employ suggestive identification techniques. *Id*.. The Supreme Court then "granted certiorari to resolve a division of opinion on the question whether the Due Process Clause requires a trial judge to conduct a preliminary assessment of the reliability of an eyewitness identification made under suggestive circumstances not arranged by the police." *Id*. (citation omitted) (footnote collecting cases omitted).[8] The Court held the circumstances of the identification of Mr. Perry standing in the parking lot with the second police officer, however suggestive, would not justify suppression because it was not police-arranged. *Id*. at 244-48.

In so holding, the *Perry* Court clarified the distinction between suggestive circumstances, and police-arranged suggestive procedures with some examples:

> Most eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do. Out-of-court identifications volunteered by witnesses are also likely to involve suggestive circumstances. For example, suppose a witness identifies the defendant to police officers after seeing a photograph of the defendant in the press captioned "theft suspect," or hearing a radio report implicating the defendant in the crime. Or suppose the witness knew that the defendant ran with the wrong crowd and saw him on the day and in the vicinity of the crime. Any of these circumstances might have "suggested" to the witness that the defendant was the person the witness observed committing the crime.

---

[8] Before *Perry*, the Sixth Circuit applied the two-step test even in instances where the witness' identification involved no police involvement. In *Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir. 1986), the Sixth Circuit held "that police machinations" are not required in determining suggestiveness because "deterrence of police misconduct is not the basic purpose for excluding identification evidence." (Citations omitted). Abrogating *Thigpen*, the Supreme Court held due process does not require federal courts to scrutinize all suggestive identification procedures, just police-arranged procedures. *Perry*, 565 U.S. at 240 n.4, 248.

*Id*. at 244.

The due process analysis is tied, "not to suspicion of eyewitness testimony generally, but only to improper police arrangement of the circumstances surrounding an identification." *Id*. at 241-42. In other words, suppression is a deterrence to improper police activity, not a cure for flawed eyewitness identifications. As a result, the "fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id*. at 245.

There is no evidence to suggest the CPD requested Dr. Ellis to seek out information on the internet, which resulted in the original out-of-court "identification" via the online March 4 mugshot. The CPD did, however, indicate or name Defendant as the prime suspect during the six-pack lineup by asking Dr. Ellis about him and revealing the fingerprint evidence. Dr. Ellis also deduced or was told that he picked the wrong photograph in the six-pack lineup. Later, the CPD also told Dr. Ellis that Defendant had been charged as the perpetrator and, in effect, that he was a very bad man in need of incarceration. Had the CPD not done so, Dr. Ellis would not have known what specific name to use for his internet search. Defendant is correct to the extent he argues that Dr. Ellis's actions in searching for images of "Montez Murphy" was only made possible by CPD's actions in naming Defendant to Dr. Ellis. Nevertheless, there is no indication the CPD encouraged Dr. Ellis to conduct an internet search in the first place.

Defendant appears to argue that it was foreseeable that Dr. Ellis would engage in internet research about the arrested person and that the March 4 mugshot, which was a police creation, could be viewed on a private website. Defendant also argues the identification during the preliminary hearing is the equivalent of a police-arranged showup corrupted by the CPD's

18

involvement in the March 4 mugshot viewing on the internet by Dr. Ellis. In short, Defendant argues the CPD, in effect, primed the pump leading to Dr. Ellis's investigation and identification of Defendant. While Defendant has attempted to bring his case within the confines of *Perry* based on the CPD's actions, he cannot.

As to the online search and identification, that there is no evidence the CPD arranged for Dr. Ellis's mugshot investigation/viewing is an insurmountable flaw in Defendant's argument. "To be sure, jail records, including mugshots of arrestees, are generally matters of public record and the media may therefore come into possession of these records under a variety of circumstances and for a variety of reasons." *Watson*, 540 F. App'x at 516 (citation omitted). The Sixth Circuit has again recently acknowledged, "booking photos form part of the public record." *Detroit Free Press Inc. v. United States Dep't of Justice*, 829 F.3d 478, 483 (6th Cir. 2016) (citing Restatement (Second) of Torts § 652D cmt. b and cmt. f, illus. 13); *see also id.* at 489-90 (Boggs, J., dissenting) (quoting the Restatement (Second) of Torts § 652D cmt. f and ill. 13, noting that "the common law did not, and does not now, recognize an indicted defendant's interest in preventing disclosure of his booking photograph during ongoing criminal proceedings."). While it might be foreseeable that a witness/victim would conduct his own online research of publicly available material upon learning the name of either the suspected or accused person, doing so does not trigger the due process remedy of suppression. *See United States v. Jones*, No. CR 16-516 (KM), 2017 WL 752830, at *3 (D.N.J. Feb. 27, 2017).

In *Jones*, a district court denied the defendant's motion to suppress eyewitnesses' identification of the defendant as a bank robber who robbed a bank using a note with his face covered by a scarf. *Id*. at *2, *7. The witnesses were only able to provide a general description of the bank robber. *Id*. at *2. Approximately four months later, a robber struck the same bank

without covering his face.  *Id.*  The witnesses told the police they believed it was the same person who robbed the bank before, "based on the robber's physical appearance and voice."  *Id.* Thereafter, based on DNA evidence, the police arrested the defendant, and the prosecutor's office sent a standard letter to the witnesses that identified the defendant as the person charged with the two bank robberies.  *Id.*  As in this case, the witnesses from the bank, armed with the defendant's name, took it upon themselves to conduct online research and found defendant's mugshot.  *Id.*

Like here, in *Jones* the defendant claimed the bank employees' eyewitness identification of him was irretrievably tainted by their exposure to his online mugshot.  *Id.* at *3.  The defendant claimed the employees' spontaneous mugshot viewing was "the equivalent of a government-arranged, suggestive identification procedure" because the prosecutor's office  provided the name of the arrested defendant to the employees.  *Id.*  Also like here, the defendant in *Jones* sought the exclusion of the identification from evidence on due process grounds.  The defendant claimed that although the employees acted on their own in viewing the mugshot, their actions were prompted by the inclusion of defendant's name in the victim/witness notification letter and that it was foreseeable to the police that the witnesses would conduct internet research and view the police-created mugshot.  *Id.* at *4.  The *Jones* court reasoned that "in any criminal case, the police will probably appear somewhere in the chain of but-for causation leading to an out-of-court identification."  *Id.* at *5.  Relying on *Perry*, the court held that "[u]nless the police arranged the allegedly suggestive identification, the reliability of eyewitness identification testimony is to be tested by the ordinary processes of a criminal trial, such as cross-examination before a properly instructed jury[,]" not exclusion.  *Id.*

A difference between *Jones* and the instant matter is that the CPD, rather than the prosecutor's office, gave Dr. Ellis the suspect's name.  I acknowledge that the *Jones* court

emphasized a lack of police "involvement" in the witnesses learning the defendant's name, rather than a lack of intent. *See id.* at *6-7. However, in this case there is no indication the police provided the name to Dr. Ellis for any reason other than as part of a standard investigation (asking if Dr. Ellis knew "Montez Murphy" to determine whether there was a non-incriminating reason Defendant's fingerprints were on Dr. Ellis's truck), and to extend him common courtesy and reassure him as the victim of a crime in their jurisdiction (responding to his email and updating him on the case). The testimony reflected these are both common practices of the CPD. A lack of intent on the part of the police might not always indicate that the police did not arrange for or create suggestive circumstances, but under the circumstances of this case, it is worth noting. The point is to deter police from "rigging identification procedures," not to prevent police from taking reasonable actions to properly carry out appropriate and essential duties. *Perry*, 565 U.S. at 241; *see also id.* at 240 (The "deterrence rationale is inapposite in cases, like Perry's, in which the police engaged in no improper conduct.").

Suppression is a remedy to hold police responsible for their own misconduct, not a remedy for when an alleged witness/victim accesses publicly available information that may taint his memory. In *Watson*, conditional guilty pleas were entered by criminal defendants to firearms charges and a violation of the Hobbs Act for their respective roles in a home invasion that resulted in a murder. *Watson*, 540 F. App'x at 513. As pertinent, one of the defendants claimed that police use of the same photograph of him that appeared in a news report on an unrelated crime prejudiced the subsequent identifications made via a photographic lineup. When the news report aired, the victims of the crime recognized the person as being the same person who had attacked them, and contacted the police. *Id.* at 512-13. The police then showed the victims a lineup that contained the same photograph shown on the news report the victims had seen. *Id.* at 514. There was no

21

evidence the police arranged to have the mugshot aired on television or deliberately used a photograph in the lineup array that they knew had just been seen widely. *Id.* at 516. On appeal, the Sixth Circuit held that the photographic lineup presented by the police was not inherently, unduly, or impermissibly suggestive in violation of the defendant's due process rights. *Id.* The Sixth Circuit so held even though the lineup contained the same mugshot of the defendant that appeared in a television newscast which precipitated the eyewitnesses' phone call to the police identifying that defendant as a perpetrator. The Sixth Circuit held the most that could be concluded was that defendant's "bad luck, not police malfeasance, led to any suggestiveness there might have been in the pretrial identification procedure[;]" and thus, there was no due process violation. *Id.* In this case, there is no evidence the police ever showed Defendant's March 4 mugshot to Dr. Ellis as part of a photographic lineup or otherwise.

As acknowledged by Defendant, it seems far more likely that Dr. Ellis did not conduct online research until after he was told of the arrest via reply email since Dr. Ellis does not mention the mugshot in his email. Moreover, he testified at the preliminary hearing that Sgt. Watkin's reply email prompted his research. That the publicly available information of an arrest was included in the reply email in this case does not require exclusion of the identifications—especially where there is no evidence to even suggest the email was sent in a CPD effort to encourage Dr. Ellis's freelance investigation. As recognized in *Jones*, a routine notice disclosing that criminal charges have been filed against a particular person and disclosing that person's name is an ordinary incident of the investigation, not a police-arranged identification procedure. *Id.*

Given that Defendant's arrest took place prior to Dr. Ellis's research, even if he conducted that research without knowing of the arrest and only based on Det. Boller's questions and comments at the six-pack lineup, the results are the same. Dr. Ellis knew that the fingerprints of a

person named "Montez Murphy" were found on his truck, and Dr. Ellis had no prior relationship with Montez Murphy that would readily explain the presence of the fingerprints. Common sense dictates Montez Murphy would have been a prime suspect for the CPD, and, he obviously was, as the CPD arrested him despite Dr. Ellis's failure to identify him at the six-pack lineup. If anything, it was Defendant's bad luck that "Right2Know" made his picture so easy for Dr. Ellis to find. *See Watson*, 540 F. App'x at 516 ("In short, the most that we can conclude is that bad luck, not police malfeasance, led to any suggestiveness that there may have been in the identification procedure. This is fatal to his argument."); *see also Perry*, 565 U.S. at 232-33..

Another case, *Holland v. Wolfenbarger*, No. 2:08-cv-13558, 2010 WL 5093100 (E.D. Mich. Dec. 8, 2010), is similar to *Watson*. In it, a criminal defendant was convicted in a state court of armed robbery at a Mobil gas station, assault with intent to murder the station cashier, and gun charges. In a habeas proceeding, the defendant claimed his counsel was ineffective for, among other things, failing to file a motion to suppress an allegedly impermissibly suggestive photographic lineup. *Id.* at *1-2. The defendant argued such a motion would have shown that the photograph array used in the lineup was impermissibly suggestive rendering the later in-court identification unreliable. *Id.* at *8. As pertinent, defendant argued the identifications were rendered unreliable because, two days before the lineup, both witnesses saw his picture on a television broadcast following the robbery of a different gas station, which occurred about a month after the Mobil robbery. *Id.* at *10. The district court determined the photographic lineup presented by the police was not unduly or impermissibly suggestive in violation of the defendant's due process rights even though the photograph of the defendant included in the lineup array was identical to the photograph that had previously aired during a television broadcast. *Id.* (citing *United States v. Pickett*, 278 F. App'x. 465, 469 (6th Cir. 2008) (holding the witnesses' viewing

of the defendant's photograph on a "wanted" poster did not render a subsequent identification of him in a photographic lineup inadmissible)).

In *Holland v. Rivard*, the court held in a habeas proceeding that a victim's in-court identification of the defendant was not unduly suggestive in violation of his due process rights, even though the victim failed to identify her attacker in two prior line-ups. 9 F. Supp. 3d 773, 792-93 (E.D. Mich. 2014). The first lineup presented by the police to the victim was a few months after the attack on her, and she did not identify anyone. The second line-up was almost a year later and included the defendant, but the victim said another person in the lineup looked similar to her attacker. *Id.* at 792. Sometime later, the victim saw the defendant's picture online in connection with an unrelated crime, and she later identified him in court at trial as her attacker. *Id.* Relying on *Perry*, the district court denied the defendant's habeas petition holding the in-court identification was proper because, "the petitioner fails to identify a single aspect of the State's investigation that was unnecessarily suggestive or that influenced the victim's identification." *Id.* at 793.

Similarly, Dr. Ellis's spontaneous online recognition/identification of Defendant lacks the police-arranged and unnecessarily suggestive identification procedure required under *Perry*. True, as in all of the above noted cases, there was some police involvement in the instant matter. Before Dr. Ellis ever viewed the March 4 mugshot, he received an email from the CPD about the arrest or he received information from the CPD indicating Defendant's fingerprints were on his truck and, at least, understood the CPD suspected Defendant was the kidnapper/robber. Nevertheless, it was Dr. Ellis who searched out the March 4 mugshot, and not the police presenting it. Defendant has not presented any case that supports his position involving similar circumstances, has not presented any authority to suggest he has a constitutional right to identification proceedings prior

to his arrest or before being named as the charged suspect, and has not addressed or discredited the cases that hold against his position, such as *Jones*.

Even so, the in-court identifications were likely informed by Dr. Ellis's knowledge of what Defendant looked like after viewing Defendant's March 4 mugshot. As the court in *Jones* found, it is practically impossible "to separate the two." 2017 WL 752830, at *8. Accordingly, to the extent Defendant is arguing for suppression of the past and any future in-court identifications because they followed Dr. Ellis's out-of-court March 4 mugshot review, this argument fails because he has not shown the mugshot review resulted from some type of unnecessary and suggestive police action. *See Summitt*, 608 F.2d at 252 ("Since we find that introduction of the pretrial identification was not improper, we need not consider whether the in-court identification had an independent basis."); *see also Perry*, 565 U.S. at 242 (clarifying due process review must be focused on "improper police arrangement of the circumstances surrounding an identification," not general suspicions regarding the reliability of eyewitness testimony).

To the extent Defendant is arguing the in-court identifications should be excluded totally independent from the online identification, the argument fails. As this Court has held, "[w]hile there is no question that there is a degree of suggestiveness to an in-court identification, it is not a result of improper law enforcement conduct." *United States v. Jackson*, No. 2:14-CR-42, 2015 WL 4557330, at *5 (E.D. Tenn. July 27, 2015). Moreover, *Perry* explained that "due process concerns arise *only* when law enforcement officers use an identification procedure that is both suggestive *and* unnecessary." 565 U.S. at 238-39 (emphasis added). Defendant has not addressed what might make any past or future in-court identifications in this case unnecessary.

That Dr. Ellis could not identify Defendant in a six-pack lineup and only identified Defendant after viewing his post-arrest March 4 mugshot, will most certainly furnish a basis for

cross-examination and may weaken Dr. Ellis's testimony in the eyes of the jury. The shortcomings of Dr. Ellis's identifications—all made under what are suggestive circumstances—are certainly fodder for cross-examination just like bias, poor vision, diminished memory, prejudice, or other impediments to the reliability of eyewitness identifications. Such shortcomings, however, do not require exclusion on due process grounds in the absence of police-arranged and unnecessary suggestiveness. *See Perry*, 565 U.S. at 244-45.

As I have not found any police-arranged undue suggestiveness in the first step of the analysis, the Court is not required to address the second step of whether Dr. Ellis's identification of Defendant as the perpetrator from his online March 4 mugshot was nevertheless reliable under the totality of the circumstances. *See Perry*, 565 U.S. at 248. For the sake of completeness, however, I will briefly address the second step of the analysis, which the parties addressed in detail.

### 2. The Second Step of the Analysis

If the Court were to determine that Defendant had met his burden to show the identification procedures were unduly suggestive contrary to my recommendation, then the Court would be required to consider the second step; that is, whether the identification process was nonetheless reliable under the totality of the circumstances. *Howard*, 405 F.3d at 469 (citations omitted). The parties did not directly address the burden of proof at the second step, but I **CONCLUDE** it must be on the Government.

At the second step, a court should consider the following factors when evaluating reliability:

> (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification.

26

*Id.* at 472 (citations omitted). If the identification is found to be reliable, it is admissible even if the procedure used was suggestive. *Id.* at 469 (citing *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000)) (other citation omitted).

> An identification infected by improper police influence . . . is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is a very substantial likelihood of irreparable misidentification, the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

*Perry*, 565 U.S. at 232 (internal quotation marks and citations omitted).

As this Court has previously held, "even if an identification is found to be 'unduly suggestive, an analysis of the totality of the circumstances under the *Biggers* test still assures us that there was no substantial likelihood of misidentification . . . .'" *Potter*, 2010 WL 2776342, at *6 (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1072 (6th Cir. 1994)) (other citation omitted). I will address the above five factors for assessing reliability as to the March 4 mugshot out-of-court identification and later in-court identifications.[9] The factors generally overlap in each of the identifications at issue, but with some differences as noted. Moreover, the first three factors are closely related and were argued in a combined fashion by Defendant, but I will address them separately.

---

[9] To the extent Defendant may be suggesting the totality of the circumstances test is a balancing test between the degree of suggestiveness and the *Biggers* factors, such an approach has been rejected by this Court. *Potter*, 2010 WL 2776342, at *6 ("[B]ased on the explicit two-step evaluative test used by the Sixth Circuit and identified by the Supreme Court, this Court does not find the analysis urged by defendant to be correct. Accepting the defendant's analysis of a suggestive identification would transform the two-step test into a balancing test, not the explicit one step, two step process described by case law.").

As to the first factor addressing the initial observation opportunity, Dr. Ellis viewed and conversed with the kidnapper/robber in close proximity in the front seat of his truck for some 20 to 25 minutes. Most of Defendant's arguments about the possible flaws in Dr. Ellis's observations are jury arguments about what he contends are deficiencies in Dr. Ellis's eyewitness testimony and his failure to identify Defendant from his juvenile mugshot during the six-pack lineup. Although Dr. Ellis was slowly driving in what was, no doubt, an extremely stressful situation and the kidnapper/robber was wearing a hoodie with the hood up, I **CONCLUDE** the first factor weighs in favor of a finding of reliability.

As to the second factor, the degree of attention during the initial observation, Dr. Ellis's testimony indicates he was engaged and paying a great deal of attention to the perpetrator and his predicament. Again, Defendant points to Dr. Ellis's failure to identify his juvenile mugshot and his selection of an alternative photograph with certainty in the six-pack lineup. That Dr. Ellis quickly excluded Defendant's juvenile mugshot as being of the perpetrator definitely might cause a factfinder to question his identifications. However, I **CONCLUDE** the appearance of Defendant in his juvenile mugshot and in his March 4 mugshot are different enough to indicate why Dr. Ellis did not select the juvenile mugshot after being in close contact with the kidnapper/robber for an extended period of time and does not weigh in favor of finding he was not paying attention to the perpetrator during his ordeal. I also **CONCLUDE** the second factor also weighs in favor of reliability.

As to the third factor, the accuracy of Dr. Ellis's prior description, there is little evidence regarding how accurately Dr. Ellis described his assailant to CPD the night of the incident. "The Sixth Circuit has noted that accuracy 'refers to how *particularly* a description matches a suspect[,]' including weight, build, hairstyle, or facial hair." *Potter*, 2010 WL 2776342, at *7 (quoting

28

*Thigpen,* 804 F.2d at 897 (emphasis in original) (alteration in original) (now abrogated by *Perry*)). Even cobbling together all the testimony, the most that can be said on the current record is that Dr. Ellis described an African-American male wearing certain clothing items and that Det. Boller thought Defendant met the described physical characteristics. Little-to-no evidence was offered regarding how Dr. Ellis described his assailant's physical characteristics, such as height, build, and facial structure, or other descriptive attributes, such as visible tattoos, to the CPD the night of the incident. During testimony about the six-pack identification, Dr. Ellis described the perpetrator as heavier, having a "rough" face, and not clean-shaven. During the suppression hearing, he said the perpetrator had no visible tattoos. The best I can tell, however, the record is lacking regarding what Dr. Ellis told the CPD on this topic prior to Defendant's arrest. As the Government provided little direct testimony about the description of the perpetrator provided by Dr. Ellis to the CPD prior to Defendant's arrest and it bears the burden of proof at the second step, I **CONCLUDE** this factor is neutral at best, or weighs against the Government, on the current record.

As to the fourth factor, the level of certainty shown by the witness at the pretrial identification, Dr. Ellis testified he was instantly convinced the March 4 mugshot was of the kidnapper/robber as soon as he saw it. He remained certain Defendant was the perpetrator at both the state court preliminary hearing and at the suppression hearing. It is concerning Dr. Ellis knew that Defendant's fingerprints were on his truck, that he had not picked Defendant's photograph in the six-pack lineup, and that Defendant had been arrested for the kidnapping/robbery all before he made any identification of Defendant as the perpetrator. Certainly, Dr. Ellis's knowledge of the fingerprint evidence and the arrest are suggestive and possibly could have swayed him to a predisposition to selecting Defendant as the perpetrator. Similarly, in-court identifications are inherently suggestive as it is customary for defendants to sit at counsel table or appear at the

29

podium where they can typically be recognized as the defendant. Yet, there is no constitutional right to implementation of a pretrial identification proceeding. Also troubling to me in weighing this factor is that Dr. Ellis originally contended—again with 100% certainty the day after the incident—that another man in the six-pack lineup was the perpetrator based, at least in part, on his conclusion the man in the selected photograph looked "meaner" or "scarier." While this will surely be fodder for cross-examination, I still **CONCLUDE** this factor weighs in favor of reliability as Dr. Ellis is adamant that he immediately and with certainty recognized Defendant in the March 4 mugshot, which more closely resembled Defendant's appearance the day of the incident and at the preliminary hearing than the "older" juvenile mugshot.

As to the final factor, the length of time between the incident and the identification of Defendant based on the March 4 mugshot, was either five or seven days. The preliminary hearing was held March 14, only two weeks after the incident. The suppression hearing was conducted a year and a half after the incident and the trial will occur even longer after the incident. As to the first two identifications at issue in the motion, the length of time is short and weighs strongly in favor of reliability. The length of time between the incident and any future trial identification obviously does not bolster the reliability of any in-court identification at trial, but it does not destroy it either. It is not unusual for a jury to need to weigh the reliability of a witness's recollection after such lengths of time. As to this factor, I **CONCLUDE** the length of time between the initial observation and the identifications also weighs in favor of reliability.

My consideration of the totality of the circumstances, specifically considering each of the factors under the five-factor test applicable in the second step of the analysis, results in a **FINDING** that the challenged identifications are sufficiently reliable to preclude "a very substantial likelihood of irreparable misidentification." *See Perry*, 565 U.S. at 232 (quoting

*Simmons v. United States*, 390 U.S. 377, 384 (1968)). As previously noted, suppression is a deterrence to improper police activity, not a cure for flawed eyewitness identifications. *See id.* at 245.

### 3. In-Court Identification Reliability Issue

I will also briefly address an issue not directly raised by the parties; that is, the post-*Perry* circuit split regarding whether due process always requires courts to conduct a reliability assessment of an in-court showup identification. *Compare United States v. Thomas*, 849 F.3d 906, 910 (10th Cir. 2017) (collecting cases) (reliability analysis of in-court identifications required only after the defendant establishes improper police conduct), *cert. denied,* 138 S. Ct. 315, 199 L. Ed. 2d 208 (2017); *Cf. United States v. Whatley*, 719 F.3d 1206, 1216-17 (11th Cir. 2013) (same), *with Lee v. Foster*, 750 F.3d 687, 691-92 (7th Cir. 2014) (relying on *Biggers* to conduct a reliability analysis of an in-court identification), *United States v. Greene*, 704 F.3d 298, 308 (4th Cir. 2013) (same), *and United States v. Correa-Osorio*, 784 F.3d 11, 19-20 (1st Cir. 2015) (declining to decide whether *Perry* or *Biggers* requires a reliability analysis for in-court identifications, while reaching the same result under either). Central to this court divide is the question of whether *Perry* extends to in-court identifications.

It appears that the Sixth Circuit has not directly answered this question. In an unpublished opinion, however, the Sixth Circuit relied on *Perry* to hold an in-court identification of a defendant was not *impermissibly* suggestive because "the Supreme Court has recently made clear that due process rights of defendants identified in the courtroom under suggestive circumstances are generally met through the ordinary protections in trial." *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014) (citing *Perry*, 565 U.S. at 244-48). Furthermore, the Supreme Court in *Perry* at least suggested that it did not want all in-court identifications to be subject to judicial

reliability screening. 565 U.S. at 241 (requiring a reliability analysis of identifications "only after the defendant establishes improper police conduct"). Accordingly, I **FIND** a reliability analysis of the in-court identifications is not required in this case.

Due process will only preclude the admission of evidence when it "is so extremely unfair that its admission violates fundamental conceptions of justice." *Perry*, 565 U.S. at 237 (quoting *Dowling*, 493 U.S. at 352) (other citation omitted). *See also Manson v. Brathwaite*, 432 U.S. 98 (1977) ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."). The flaws in Dr. Ellis's identifications may possibly discredit his testimony before a factfinder, but they do not reach the high threshold for suppression.

### B. Defendant's Alternative Evidentiary Challenge

In the alternative, Defendant briefly argues that Dr. Ellis's pretrial identifications should be barred from evidence under Rule 403's balancing test for the same reasons they should be suppressed based on alleged due process violations. Defendant suggests the probative value of the identifications is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and/or the possibility the jury will be misled. Puzzlingly, the Government did not directly address Defendant's alternative Rule 403 or unfair prejudice arguments. However, the Government did argue that Dr. Ellis's past and any future identifications are reliable under the second step of the due process test.

In making his Rule 403 argument, Defendant again questions the reliability of the identifications based on the passage of time, Dr. Ellis's failure to make the initial identification during the six-pack photographic lineup, and the suggestive nature of the post-arrest, online

32

mugshot viewing and preliminary hearing "showup" identification. Defendant mainly argues the past and any future identifications are so unreliable they fail the Rule 403 balancing test because the possibility of misidentifications is great and unfairly prejudicial. My overall conclusion is that the parties' arguments are too underdeveloped to fully address this important evidentiary ruling at this time.

Defendant is correct that the pretrial identifications may be barred or limited under Rule 403, even if they are not excludable under the Due Process Clause. The *Perry* Court contemplated that, even where the police did not arrange an unduly suggestive identification, its reliability could still be tested by the ordinary processes of a criminal trial such as "the presence of counsel at post-indictment lineups, vigorous cross-examination, *protective rules of evidence*, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt." *Perry*, 565 U.S. at 233 (emphasis added). Indisputably, Rule 403 is one such protective rule of evidence. Also as pointed out in *Perry*, trial safeguards in recent years have increasingly included "expert testimony on the hazards of eyewitness identification evidence." 565 U.S. at 247 (citation omitted). At this stage of the proceedings, it is unknown whether either party intends to use the services of such an expert.

In addition, the in-court and out-of-court/pretrial and trial identification considerations are intertwined in this case. For instance, it might be misleading to conduct an in-court identification at trial without reference to the possible taint of Dr. Ellis's online mugshot research and observation of Defendant at the state court preliminary hearing. Indeed, it is quite likely that the defense will want to address the suggestive effect of the out-of-court identification if an in-court identification is allowed. The Court could also choose to consider more than just the five factor test employed in connection with step two of the due process analysis in assessing the Rule 403

33

arguments—a topic not addressed by the parties. Additionally, Defendant's motion suggests he does not yet have all the information he may need to fully and comprehensibly address all eyewitness identification issues [Doc. 31 at Page ID # 108-09].

The strong probative value of Dr. Ellis's eyewitness identifications is obvious and undisputed. I **CONCLUDE** any assessment of the probative value of Dr. Ellis's eyewitness identifications against the danger of unfair prejudice is premature at this time. Moreover, it is likely the Court did not anticipate receiving a report and recommendation on the alternative evidentiary issue. If, however, the Court is seeking a recommendation on the Rule 403 alternative motion in limine, I respectfully request that the Court re-refer that issue so that the parties can more completely address their respective Rule 403 arguments before a recommendation is made.

## III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[10] that Defendant's motion to suppress on constitutional due process grounds [Doc. 31] be **DENIED** and that the Court reserve ruling on the alternative arguments for exclusion of evidence at trial under Rule 403.

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[10] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).