UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 1:17-cr-131 |
| v. | ) | |
| | ) | Judge Mattice |
| | ) | Magistrate Judge Lee |
| MONTEZ MURPHY | ) | |

## ORDER

This matter is before the Court upon Defendant's Objections [Doc. 48] to Magistrate Judge Susan K. Lee's Report and Recommendation ("R&R") [Doc. 45]. In her R&R, Magistrate Judge Lee recommended Defendant's Motion to Suppress [Doc. 31] be denied. Defendant challenges the R&R's legal conclusions. [*See* Doc. 48]. The Government has responded to his arguments. [Doc. 49]. Upon review and for the reasons that will be discussed further herein, Defendant's objections are hereby **OVERRULED**. Because the Court **ACCEPTS and ADOPTS** Magistrate Judge Lee's R&R [Doc. 45], Defendant's Motion to Suppress [Doc. 31] will be **DENIED**.

## I. BACKGROUND

Neither party objects to the Magistrate Judge's factual findings, and the Court believes that they are accurate. Accordingly, the Court expressly adopts Magistrate Judge Lee's findings. Those findings, as summarized by her, are as follows:

> During the evidentiary hearing on Defendant's motion to suppress held on September 6, 2018, Defendant presented the testimony of Hamilton County Executive Assistant District Attorney Cameron Williams ("Attorney Williams"), Chattanooga Police Department ("CPD") Detective Bryon Boller ("Det. Boller") and CPD Sergeant Jon Watkins ("Sgt. Watkins"). The Government presented the testimony of Dr. Ellis.
> Dr. Ellis asserts he was robbed after being kidnapped at gunpoint from a store parking lot on Monday, February 27, 2017 around 5:10 p.m. According to Dr. Ellis, an African-American man—wearing a hoodie

sweatshirt with the hood up, but not wearing a mask or gloves—opened the passenger side door of his truck, brandished a firearm, and entered the front passenger seat. The man, who eventually said that his name was Michael and that he was homeless, ordered Dr. Ellis to drive away. A short distance later, the man ordered Dr. Ellis to stop at what the man said was a crack house and give him money. Dr. Ellis complied and gave the man $200 out of his wallet.

Seeing Dr. Ellis's credit/bank cards, the man then ordered Dr. Ellis to drive to a nearby bank, withdraw $200 from the drive-through automated teller machine ("ATM"), and give it to him. While at the ATM, the man pulled the hood of his hoodie forward to conceal his face from the ATM camera. After Dr. Ellis drove away from the ATM, the man commanded Dr. Ellis to drive to a nearby vacant lot.

As the man left Dr. Ellis's truck, he took Dr. Ellis's cell phone so that Dr. Ellis could not immediately summon the police. Dr. Ellis drove away and was almost immediately able to wave down a CPD patrol officer around 5:30 p.m. Dr. Ellis and the patrol officer returned to the store and the CPD's ensuing investigation began that same night.

Dr. Ellis acknowledged he was "scared to death" and focused on driving during much of the 20 to 25 minute encounter. In spite of driving and having a gun shoved in his side at least twice during the ordeal, Dr. Ellis contends that he got a good look at the perpetrator's face as he engaged the man in conversation. During the hearing, Dr. Ellis described the perpetrator as a heavier, African-American man with a rough, shaven face. He also said the man's hoodie was blue, the man wore dark saggy pants, and the man looked "kind of unkept."

Sgt. Waktins, at the time a CPD detective, was assigned to the case as the lead investigator. That evening, Det. Boller, then a CPD investigator, "lifted" fingerprints from the truck, including from the exterior of the front passenger door. The kidnapper/robber had placed his hand on the exterior of the passenger door during the ordeal, according to Dr. Ellis. Dr. Ellis testified that the officer who "did the printing" told him that he "found a great fingerprint, a full set on the passenger door." Based on a match of Defendant's fingerprints to the print taken from the exterior of the front passenger door, Det. Boller and Sgt. Watkins began to focus on Defendant. While Defendant was previously unknown to the officers, he had a criminal record and was listed in CPD records as being affiliated with a local gang. Det. Boller retrieved an arrest photograph, i.e., a mugshot, of Defendant taken when Defendant was a juvenile.

Using Defendant's juvenile mugshot, Det. Boller employed a CPD computer program designed to generate either a six- or an eight-photograph lineup. The computer program is intended to select photographs of persons with characteristics—such as gender and race—that are similar to a suspect's mugshot or other photograph. The resulting photographic lineup in this case consisted of six full-page photocopies of photographs (a "six-pack lineup") of black males [Defendant's Exhibit 2].

Defendant's juvenile mugshot was the third photograph in the six-pack lineup.

The day after the crime, Tuesday, February 28, 2017, Det. Boller and another CPD patrol officer presented the six-pack lineup to Dr. Ellis in the parking lot of the hospital where Dr. Ellis worked to see if Dr. Ellis could identify the kidnapper/robber. Pursuant to CPD policy, Det. Boller presented the six-pack lineup instead of Sgt. Watkins because Det. Boller was less involved in the investigation. This policy exists to lessen the chance of police suggestion of the photograph of the person the police suspect to the eyewitness. At the time of the six-pack lineup, Dr. Ellis had had no communications with the CPD since the prior night other than a call about the logistics of where and when to meet for the lineup.

Before the six-pack lineup was shown to Dr. Ellis, Det. Boller gave instructions to Dr. Ellis to look for remembered facial characteristics because the photographs might be "older" or newer, and the depicted person could weigh more or less or have different facial hair. Initiating the sixpack lineup presentation, the photographs were laid across the hood of the patrol car for Dr. Ellis to consider. The presentation is recorded [Defendant's Exhibit 1], but the audio of some of the conversation between Det. Boller and Dr. Ellis is not recorded based on the testimony.

As the third photograph in the six-pack lineup, Defendant's juvenile mugshot was placed in the center of the lineup array, which was laid across the hood of the patrol car.[1] Dr. Ellis almost immediately excluded the photograph of Defendant, along with three other photographs, saying they did not depict the perpetrator. He then selected one of the two remaining photographs as being of the perpetrator. When asked if he was certain of his selection during the six-pack lineup, Dr. Ellis said he was "100% sure" the selected photograph depicted the perpetrator.

Det. Boller never directly identified any of the photographs in the six-pack lineup—either the selected or excluded photographs—as being of Montez Murphy. However, as soon as the photographs were put away, Det. Boller asked Dr. Ellis if he knew anybody by the name of Montez Murphy and Dr. Ellis replied he did not. Det. Boller then asked if there was any reason why Montez Murphy's fingerprints would be "on or in" Dr. Ellis's truck. Dr. Ellis said there would be no such reason. Det. Boller asked Dr. Ellis these questions because Det. Boller knew the CPD had been able to lift and identify Defendant's fingerprints from the exterior of the passenger door of Dr. Ellis's truck and yet Dr. Ellis had selected the photograph of someone else as the perpetrator—and had excluded Defendant's photograph.

---

[1] M. Judge Lee's FN2: At the suppression hearing, Dr. Ellis testified he was shown five photographs, but the evidence is overwhelming that he was actually shown six photographs, and I so **FIND**. Dr. Ellis also indicated he may have been questioned about the name Montez Murphy before the six-pack lineup, but Det. Boller testified he asked about the name after. The video shows Det. Boller raising Defendant's name after Dr. Ellis identified another man's photograph as the perpetrator. [Doc. 45 n.2].

Dr. Ellis testified he asked the officers if he had picked the "photograph of the person whose fingerprints were on my truck and they said no." Dr. Ellis specifically testified, "They told me I did not select the right one." In addition, Dr. Ellis testified he "knew" from Det. Boller's questions, that Montez Murphy was the name of the person the CPD suspected based on the fingerprint evidence. Specifically, he testified, "I knew that Montez Murphy's fingerprints were on my truck and that's the person that I should have selected. And, I was bothered by why could I not have picked out his photograph." Dr. Ellis testified that he felt as if he had "failed a test" by selecting the wrong photograph the day of the six-pack presentation.

The following Saturday, March 4, 2017, Defendant was arrested on state charges for the crimes perpetrated against Dr. Ellis. As a result, a March 4 mugshot of Defendant was taken by the CPD. The March 4 mugshot of Defendant was published that same day in "Right2Know," an online publication of a private news organization. Defendant's Exhibit 6 is a printout of the "Right2Know" publication of Defendant's March 4 mugshot that indicates it was one of 28 new mugshots from Hamilton County published online by the news organization that day.

Exactly when Dr. Ellis first saw that March 4 mugshot is far from clear. In Dr. Ellis's testimony at the earlier state court preliminary hearing on March 14, 2017, he testified that he first saw the March 4 mugshot after he was notified by email of Defendant's arrest.[2] In the suppression hearing, however, Dr. Ellis testified he did not know of the arrest when he "googled" Defendant's name; instead, he had become curious about the name Montez Murphy mentioned by Det. Boller during the six-pack lineup so he "googled" the name Saturday evening (March 4) and discovered the arrest. During the suppression hearing, Dr. Ellis also expressed some uncertainty about exactly when he first looked up the March 4 mugshot. Nevertheless, Dr. Ellis consistently testified in both hearings that he conducted an online "google" search on his own and located the March 4 mugshot of Defendant. Upon finding the March 4 mugshot, Dr. Ellis immediately concluded Defendant's March 4 mugshot depicted the man who had kidnapped and robbed him. He testified the March 4 mugshot was "without a doubt" a photograph of the person in his vehicle.

---

[2] <u>M. Judge Lee's FN3:</u> I hesitate to call this an out-of-court "identification" because it is perhaps more accurately described as a realization. The parties submitted no proof that this identification—which is not mentioned in the emails—was ever communicated by Dr. Ellis to law enforcement in any way other than perhaps just prior to the preliminary hearing where Dr. Ellis made an in-court pretrial identification. In the version of events promulgated in the Government's original brief, Dr. Ellis was informed of Defendant's arrest from Sgt. Watkins in an email on March 6, and then spontaneously "googled" Defendant's name and found the March 4 mugshot [Doc. 36 at Page ID # 130]. While the Government's version is not evidence, it is consistent with Dr. Ellis's testimony at the state preliminary hearing as detailed herein. An audiotape of portions of the preliminary hearing and a transcript of those portions of the hearing were marked as Defendant's Exhibit 5, and support this version of events. The email exchange between Dr. Ellis and Sgt. Watkins also suggests Dr. Ellis did not know that Defendant was under arrest until after he received the March 6 email, [Defendant's Exhibits 3 & 4], in spite of Dr. Ellis's contradictory testimony. [Doc. 45 at n.3].

None of the witnesses testified about any contact between Dr. Ellis and the CPD between the February 28 six-pack lineup and the following Monday, March 6, 2017. On that Monday at 1:34 p.m., Dr. Ellis sent an email to Sgt. Watkins stating: "Dr. Eric Ellis here. Any leads on my little incidence[sic] last Monday? I know the finger prints yielded a match but I was unable to id the guy. What's next? Still want to get this guy off the streets." [Defendant's Exhibit 4].[3] This email does not mention that Dr. Ellis had seen the March 4 mugshot.

At 4:50 p.m. on that same day, Sgt. Watkins sent a reply email to Dr. Ellis stating, among other things, that a suspect had been identified from the fingerprint evidence, the suspect was Montez Murphy, and he had been arrested March 4 and charged for the crimes perpetrated against Dr. Ellis [id.]. The reply email also estimated when Defendant's initial court hearing would take place. The reply stated Defendant was a "threat to our community" and that, with the collaboration of the FBI and ATF, there should be "a long reprieve from [Defendant's] predatory acts within Chattanooga," and that Dr. Ellis should expect to hear from the FBI and the ATF soon as they would also be seeking to prosecute Defendant [id.].

Dr. Ellis appeared as a witness in the Hamilton County General Sessions Court for Defendant's preliminary hearing on March 14, 2017. Prior to testifying, Dr. Ellis met with Attorney Williams (and possibly Sgt. Watkins) to prepare. During the meeting, Dr. Ellis informed Attorney Williams about his failure to identify Defendant in the six-pack lineup and about his subsequent google investigation and observation of the online March 4 mugshot. Evidence at the suppression hearing did not clearly indicate when after the Defendant's arrest Dr. Ellis first informed a member of the CPD that he found the March 4 mugshot in a google search and concluded Defendant was the kidnapper/robber.

During the state court preliminary hearing, and again at the suppression hearing, Dr. Ellis identified Defendant as the perpetrator. Dr. Ellis testified he had no doubt at all in his mind when identifying Defendant as the perpetrator at the preliminary hearing and again at the suppression hearing. At the time of both identifications, Defendant was the only shackled, black man dressed in inmate attire present at the podium in state court and at the defense table during the suppression hearing.

Explaining why he excluded the photograph of Defendant (and three others) during the six-pack photographic lineup at the preliminary hearing, Dr. Ellis testified that the men in the quickly excluded photographs

---

[3] <u>M. Judge Lee's FN4:</u> Little-to-no evidence was submitted regarding any efforts made by the Government to locate emails between Dr. Ellis and the CPD other than Sgt. Watkins' testimony indicating that he unsuccessfully looked for such emails on his computer at some point. On the day prior to and on the day of the suppression hearing, however, Dr. Ellis apparently provided copies of his above described March 2017 email exchange with Sgt. Watkins [Defendant's Exhibit 4], plus a May 2017 email exchange about a possible state court trial date [Defendant's Exhibit 3].

appeared to be thinner with more of a "Latino decent" than the perpetrator.[4] Regarding the two photographs left at that point, and the photograph he ultimately identified as being of the alleged perpetrator, Dr. Ellis testified at the preliminary hearing that he chose one of the two remaining photographs because it showed a man with a "rough face" while the other remaining photograph showed a clean shaven, handsome man. During the suppression hearing, Dr. Ellis said he selected the photograph of the "meaner looking person" and the "scariest guy" from the two remaining photographs.[5]

Comparing Defendant's juvenile mugshot to Defendant's March 4 mugshot and with the way Defendant allegedly looked on the day of the incident, Dr. Ellis concluded his prior misidentification during the six-pack lineup made "sense" because Defendant was younger and clean-shaven in the juvenile mugshot. Dr. Ellis also concluded that both the March 4 mugshot and Defendant's appearance at the preliminary hearing revealed a rougher look with more facial hair than was shown in the juvenile mugshot.

Attorney Williams at some point also looked at the juvenile mugshot of Defendant and found that Dr. Ellis's explanation of why he did not select that photograph made sense because it showed Defendant when he was younger and clean-shaven. According to Attorney Williams, in the March 4 mugshot Defendant looked rougher, and in the preliminary hearing he looked even rougher, than was depicted in the juvenile mugshot. No evidence was offered concerning the date the juvenile mugshot was taken, but the witnesses at the suppression hearing generally opined the juvenile mugshot depicted Defendant when he was younger, thinner, and cleaner-shaven.

Sgt. Watkins testified it is common practice for the CPD to inform the victim of the arrest of a suspect and other case developments. In addition, either the District Attorney's Office, the CPD, or perhaps both must inform the victim/witness of the date/time/place of the preliminary hearing, including the name of the case, which also identifies the person charged. Sgt. Watkins acknowledged it is easy for the public to look up mugshots on the internet and not surprising that a witness/victim would do so.

During the suppression hearing, Sgt. Watkins and Attorney Williams could recall no investigation into the person depicted in the selected photograph during the six-pack lineup. Neither CPD witness indicated he made an effort to determine other possible ways that Defendant's fingerprints might have ended up on Dr. Ellis's truck other than asking Dr. Ellis questions about that possibility during the six-pack lineup. The law enforcement witnesses also acknowledged that, given the nature of the

---

[4] M. Judge Lee's FN5: Det. Boller testified that, in his opinion, none of the four photographs quickly excluded by Dr. Ellis during the six-pack lineup, including Defendant's, had a Latino appearance.

[5] M. Judge Lee's FN6: This testimony is some indication that Dr. Ellis believed a photograph of the perpetrator would be present in the six-pack lineup array, although he was not directly asked about any such belief.

> charges against Defendant in state court and his alleged gang affiliation, this case was of heightened interest and significance to them and the community.
>
> Concerning another matter of potential interest, Dr. Ellis testified that he reviewed a video from a smoke shop camera on the day of the kidnapping/robbery that captured relevant moments of the incident. He was "certain" that the CPD officers were aware the night of the incident that there was video surveillance evidence from the adjacent shop showing Defendant in the parking lot at 5:01 p.m. near Dr. Ellis's vehicle as Dr. Ellis approached his vehicle. At least one, if not both, of the CPD officers testified they were not aware of any video surveillance evidence of the incident from the surrounding stores.

[Doc. 45 at 2–10].

## II. ANALYSIS

Asserting the Constitution's Due Process Clause is a broad shield, Defendant seeks refuge therein. He asserts its protections require the identification testimony of Dr. Ellis, the sole eyewitness and victim in this case, be suppressed at trial. Magistrate Judge Lee has found Defendant's arguments falter under the weight of precedent. He objects to that determination and raises a scattershot of issues, but the Court finds his relevant objections are condensable into two issues. In sum, he claims the police suggestions were impermissible as defined by the controlling case here, *Perry v. New Hampshire*, 565 U.S. 228 (2012), and he asserts the Magistrate Judge incorrectly applied the reliability factors set out in *Mason v. Brathwaite*, 432 U.S. 98 (1977). [Doc. 48]. The Court will review these issues in turn.

### A. *PERRY V. NEW HAMPSHIRE*

The day after he was robbed, Dr. Ellis's mistakenly identified a nonsupect in a six-pack photo array, which included a mugshot of Defendant when he was a juvenile. This necessarily raises an issue regarding Dr. Ellis's reliability as a witness, but "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an

eyewitness identification ..." *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012). Instead, it has "traditionally" been the role of juries, not judges, to weigh eyewitness testimony, including a witness's reliability. *Id.* at 245; *see also* Doc. 45, M.J. Lee's R&R, at 32 ("[E]vidence with some element of untrustworthiness is customary grist for the jury mill." (parenthetically quoting *Brathwaite*, 432 U.S. at 116)). Due to this, the Supreme Court has been "unwilling[] to enlarge the domain of due process" and replace the role and purpose of the petit jury, which is seen as the chief bulwark against unreliable evidence. *Id.* at 245, 237 (Ginsburg, J., writing).

The calculus changes, however, when an eyewitness's identification is made under "unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248. Under those circumstances, the Due Process Clause imposes a reliability "check," which serves as a proxy for evaluating whether the identification evidence is nothing more than a product of improper police suggestions. *Id.* at 239. If the testimony fails meet this check, "due process" will step in and exclude the unreliable testimony. *See id.*[6] But this "due process check for reliability ... comes into play *only* after the defendant establishes improper police conduct." *Id.* at 241 (emphasis added).

Magistrate Judge Lee found no evidence of "unnecessarily suggestive" police tactics surrounding Dr. Ellis "identifying" Defendant as his robber. Defendant objects. In doing so, he mostly raises "general objection[s]," which merely restate arguments previously raised and addressed, or his objections do nothing more than "state a disagreement with" the Magistrate Judge's findings. *VanDiver v. Martin*, 304 F. Supp.

---

[6] Since this rule's creation half of a century ago, the United States Supreme Court has held "pretrial identification procedures violated the Due Process Clause *only once*, in *Foster v. California*, 394 U.S. 440 (1969)." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (per curiam) (emphasis added).

2d 934, 937 (E.D. Mich. 2004). Such objections are insufficient because they do nothing "to alert the court to alleged errors on the part of the magistrate judge." *Id.* Accordingly, on that basis alone they are due to be overruled. Nonetheless, the Court will briefly address some of Defendant's arguments.

There are only three instances in which the police arguably could have unnecessarily suggested to Dr. Ellis that Defendant was his robber.[7] Of the three, two are easily discarded. The first of those happened immediately after the photo array when police asked Dr. Ellis whether he knew Defendant. Doing so was not "*uneccessarily* suggestive." *Perry*, 565 U.S. at 248 (emphasis added). Asking Dr. Ellis whether he knew Defendant was *necessary* given that it was likely the only definitive means of discovering exculpatory reasons Defendant's fingerprints were found on Dr. Ellis's vehicle after the robbery. *See Summitt v. Bordenkircher*, 608 F.2d 247, 252 (6th Cir. 1979) (holding that even the inherently suggestive "showup" can be at times a "necessary identification procedure").

Dr. Ellis's in-court identification of Defendant during a state court pretrial hearing is the second arguable instance of suggestiveness that can be easily dismissed. Magistrate Judge Lee, relying on an unpublished Sixth Circuit decision, found this identification was not made after "*impermissibl[e]*" suggestiveness. [Doc. 45 at 31 (emphasis in original) (citing *United States v. Hughes*, 562 F. App'x 393, 398 (6th Cir. 2014)]. Defendant did

---

[7] Defendant raises issues with how the six-pack photo array was conducted, arguing police implemented suggestive techniques when conducing it (*e.g.* placing a paperweight on Defendant's mugshot but not on the five other photos). In any event, regardless of whether police acted suggestively during the photo array, Dr. Ellis failed to pick Defendant and instead picked a nonsuspect, filler photo. Obviously, if there were any suggestiveness, it was not effective. Also, although it's true Dr. Ellis did realize he had failed to pick the photograph of the suspect—other than the photo he thought he had incorrectly picked—he was not aware which of the other six photos was the one of the suspect. Given this, the Court finds the lineup was not conducted in an effectively suggestive manner.

not object to this finding, but instead argues the in-court identification should be excluded from evidence as "fruit of the poisonous tree," with the poisonous tree being one of the two prior alleged police suggestions. [Doc. 48]. Because it is without objection, the Court will leave this finding undisturbed.

### 1. Sergeant Watkins's Email

The remaining viable instance of arguable suggestiveness occurred when Chattanooga Police Sgt. Jon Watkins emailed Dr. Ellis and named Defendant as the suspect whose fingerprints had been found on Dr. Ellis's vehicle. Defendant argues this email was "essentially" an "arranged" showup because it gave Dr. Ellis all he needed to web search Defendant's name and look at his most recent mugshot. The Court disagrees with this characterization.

The Court finds Sgt. Watkins's email is not the type of "arranged" police identification procedure contemplated by *Perry*. To demonstrate why, it is important to keep in mind *Perry*'s lessons—which address the purpose and scope of the *Stovall* case line, regarding impermissibly suggestive police tactics. To summarize, *Stovall* and its progeny are narrowly concerned with a particular type of "unfair" law enforcement practice, which is suggestive "police-arranged identifications—think photo-arrays, showups, and lineups." *United States v. Correa-Osorio*, 784 F.3d 11, 19 (1st Cir. 2015). Prior to *Stovall*, police could, without repercussion, rig arranged identification procedures to make a target suspect obvious to the identifying eyewitness (*e.g.* police conducting a lineup using fillers that do not look similar to the suspect, making the suspect wear distinctive clothing "which the culprit allegedly wore," *etc.*). *Id.* at 243. The purpose or effect of the police rigging—whether or not intentional—was to manufacture positive identification evidence. The *Stovall* case line sought to deter those suggestive

procedures by suppressing evidence derived from them. *See Perry*, 565 U.S. 721 ("Our decisions ... turn on the presence of state action and aim to deter police from rigging *identification procedures*, for example, at a lineup, showup, or photograph array." (emphasis added)). Given this, the existence of such suggestive identification procedures is a necessary condition before *Stovall*'s due process protections are invoked. *Perry*, 565 U.S. at 232 n.1. "As our case law makes clear, what *triggers* due process concerns is police *use of an unnecessarily suggestive identification procedure* ..." *Id.* (emphasis added); *United States v. Washam*, 468 F. App'x 568, 570 (6th Cir. 2012) (holding due process will prohibit evidence only after a defendant demonstrates an "*identification procedure* was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (emphasis added) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968))). Or in other words, *Stovall*'s "due process concerns" are not "trigger[ed]" without the presence of "an unnecessarily suggestive identification procedure." *Id.*; *Washam*, 468 F. App'x at 570–71.

The major flaw with Defendant's reliance on Sgt. Watkins's email as a basis for an "unnecessarily suggestive identification procedure" is that email did not ask Dr. Ellis to identify anyone. *See, e.g.*, *United States v. Greenstein*, 322 F. App'x 259, 264 (3d Cir. 2009) (holding although the eyewitness saw a photograph of the defendant lying on a detective's desk, it was not an unnecessarily suggestive identification procedure because "no one suggested [the eyewitness] examine the photograph for the purpose of making an identification"). Defendant avers that "police effectively sat [Dr. Ellis] in front of the Defendant" by simply disclosing his name. [Doc. 48 at 6]. On the other hand, it was Dr. Ellis, operating solely under his own volition, who took it upon himself to personally access a computer to search Defendant's name and find a privately-operated, news-owned

website that had independently chosen to upload and display Defendant's most recent mugshot. Defendant argues this action is distinguishable from *Perry*'s facts, but to the contrary, Dr. Ellis's actions seem like a high-tech version of the *Perry* eyewitness's actions—who, without a police request, walked to her kitchen to identify the suspect. *Perry* was arguably a closer call because at least there police prompted the eyewitness to describe the culprit just before she spontaneously walked to the window and made an identification. *See, e.g., id.* at 256 ("Presumably, in the majority's view, had the police asked [the eyewitness] to move to the window to identify the perpetrator, that could have made all the difference." (Sotomayor, J., dissenting)).

Defendant further claims *Perry* is distinguishable because here Sgt. Watkins notified Dr. Ellis that CPD had apprehended a suspect and he disclosed his name, and (without citation) he claims that did not happen in *Perry*. It seems Defendant is correct about *Perry*'s facts. In *Perry*, the State of New Hampshire asserted the officer "did not tell [the eyewitness] that there was a suspect in the parking lot with [another] officer." *United States v.* Perry, No. 10-8974, Br. of Respondent, 2011 WL 4365312 at *3 (Sept. 16, 2011). The Supreme Court did not address this fact, so it is not clear how it affected the analysis, if at all.

But there are reasons to dismiss this distinction that has no apparent difference. For instance, take Defendant's argument to its logical conclusion. Presumably he would argue that in *Perry* it would have been "unnecessarily suggestive" if the officers had gone to the eyewitness merely to tell her that they had apprehended a suspect and mentioned his name before she took an impromptu stroll to her window to take a look at him. If Defendant's argument were adopted as a rule, any time the police uttered a suspect's name and/or mentioned their arrest in front of an eyewitness, it would ultimately result

in the eyewitness's testimony being inadmissible unless found independently reliable. Such a rule would be overly broad, and the Court finds its breadth is unsupported by constitutional text, precedent, or an exceptional policy justification. Further, Defendant's rule would result in courts "routinely" conducting reliability examinations of witness testimony, which is an outcome *Perry* sought to avoid. As such, Defendant has failed to accord the facts here with *Perry*'s holding, and he has also failed to convincingly distinguish that case. Accordingly, Defendant's objection regarding the presence of improper police conduct is hereby **OVERRULED**.

### B. *Brathwaite* Reliability Test

Having found no improper police conduct, the analysis ends because the admission of Dr. Ellis's identification testimony does not offend due process. But even if there were arguable improper police conduct, Defendant's arguments still fail. To demonstrate why, the Court will briefly address the *Braithwaite* reliability analysis.

If a defendant shows an identification was obtained through impermissibly suggestive means, the defendant must next show that the "corrupting effect of" of law enforcement suggestion outweighs the witness's "ability to make an accurate identification." *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 114). That latter step "entails considering the witness' opportunity to view the perpetrator, degree of attention, accuracy of description, level of certainty, and the time between the crime and pretrial confrontation, then *weighing such factors against the 'corrupting effect of the suggestive identification.*" *Id.* at 254 (emphasis added). Now consider how that test applies to these facts.

When Dr. Ellis was robbed, his robber sat in the passenger seat of his truck, within reaching distance. Throughout the approximately more than twenty-minute ordeal, Dr.

Ellis admits he was mostly driving, but to be sure he was not "a casual or passing observer." *Brathwaite*, 432 U.S. at 115. Instead, the two conversed and Dr. Ellis handed money over to him twice. [Doc. 50 at 88–90]. Next when Dr. Ellis saw Defendant's updated mugshot, he claims to have instantly recognized him as his robber. This factor does weigh against Dr. Ellis's reliability, however, because after his misidentification, he then likewise claimed to be "100% sure" he had picked the correct person despite being wrong.

The length of time between Dr. Ellis's robbery and him viewing Defendant's updated mugshot, on the other hand, does not give the Court pause. Magistrate Judge Lee found it was "five or seven days" at most. [Doc. 45 at 30]. That amount of time does not render Dr. Ellis's testimony constitutionally unreliable. *Brathwaite*, 432 U.S. at 116 (holding an identification that took place days later is not "the passage of weeks or months between the crime and viewing of the photograph" that case was concerned with). As the Magistrate Judge mentioned, there is no record regarding how Dr. Ellis physically described his robber following the robbery, so the specificity factor weighs against the Government. When considering the totality of the circumstances, the Court finds the given the length of time Dr. Ellis spent in close proximity to his robber and the nature of their interaction makes his testimony slightly more reliable than not when considering the other negative factors. The question, then, is whether that is sufficiently reliable.

To determine whether "slightly more reliable than not" is sufficient, the Court must weigh that conclusion "against" the "corrupting effect of the suggestive identification." *Id.* at 114. In *Brathwaite*, for purposes of identification a police officer left a photograph of the defendant "at [the eyewitness's] office," and the officer was "not present when [the eyewitness] first viewed it ..." *Id.* The Court found there was minimal "corruptive effect"

in this procedure. *See id.* "Although identifications arising from single-photograph displays may be viewed in general with suspicion ... we find in the instant case little pressure on the witness to acquiesce in the suggestion that such a display entails." *Id.* at 116. The Court explained "[t]here [] was little urgency and [the eyewitness] could view the photograph at his leisure. And since [the eyewitness] examined the photograph alone, there was no coercive pressure to make an identification arising from the presence of another. The identification was made in circumstances allowing care and reflection." *Id.*

The Court finds, although the eyewitness in *Brathwaite* was a trained police officer, these facts are otherwise materially indistinguishable from Dr. Ellis's viewing Defendant's mugshot online while outside of police presence. Accordingly, any "corrupting effect" associated with Dr. Ellis unilaterally viewing Defendant's mugshot online is minimal. In sum, when weighing the reliability of Dr. Ellis's testimony against the "corrupting effect of the suggestive[ness]" here, the Court finds Dr. Ellis's testimony is sufficiently reliable. Accordingly, Defendant's objections to Magistrate Judge Lee's reliability determination is **OVERRULED**.

### C. Rule 403 Evidentiary Challenge

Finally, the Court agrees with the Magistrate Judge that Defendant's 403 arguments are too underdeveloped at this time to make an informed ruling. [Doc. 45 at33]. Accordingly, Defendant's motion in the alternative to exclude Dr. Ellis's testimony due to its "probative value" being "substantially outweighed" by "unfair prejudice" will be **DENIED WITHOUT PREJUDICE**. Fed. R. Evid. 403. Defendant has leave to file a relevant motion in limine within the deadlines set out in the upcoming ends of justice scheduling order. [*See* Doc. 34].

### III. CONCLUSIONS

For the reasons stated herein —

- Defendant's Objections, [Doc. 48], are **OVERRULED**;

- Magistrate Judge Lee's Report and Recommendations, [Doc. 45], is **ACCEPTED and ADOPTED**;

- Defendant's Motion to Suppress, [Doc. 31], is hereby **DENIED**; and

- Defendant's alternative Motion in Limine, [Doc. 31 at 9], is **DENIED WITHOUT PREJUDICE**.

**SO ORDERED** this 11th day of December, 2018

*/s/ Harry S. Mattice, Jr.*
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE